Scileppi, J.
(dissenting). I dissent and vote to affirm.
The burden of establishing that the principals were not qualified by character and integrity, in the first instance rests with the commission. Undoubtedly, more often than not, proof of wrongdoing will be based on inferences drawn from proven facts (White v. Benjamin, 150 N. Y. 258, 265); and, as a matter of sound administrative policy, where, from the evidence adduced either of two conflicting inferences may reasonably be drawn, the duty of weighing the evidence and choosing between equally compelling alternatives is a matter for the agency or commission, not the courts (Matter of Stork Rest. v. Boland, 282 N. Y. 256, 267; see, also, Matter of Kilgus v. Board of Estimate of City of N. Y., 308 N. Y. 620, 627). Nevertheless, though we will not sift through all the evidence, the inferences drawn must be reasonable in light of all the attending facts and circumstances : “ A mere scintilla of evidence sufficient to justify a suspicion is not sufficient to support a finding upon which legal rights and obligations are based” (Matter of Stork Rest. v. Boland, 282 N. Y. 256, 267, 273-274, supra); rather, the finding must be the product of “ ‘ such relevant evidence as a reasonable mind might accept as adequate to support a conclusion ’ ” (id., at p. 274, quoting Edison Co. v. Labor Bd., 305 U. S. 197, 229). Our task then, is not to determine what evidence preponderates, but whether established facts support the inferences drawn. Viewed in terms of that standard, the evidence adduced below is insufficient.
In the first charge the Lacquas were found to lack good character and integrity because Court Carpentry allegedly overbilled its customers in excess of $74,000, representing some 11,757 hours of work. In point of fact, there is no direct evidence to support the charge of overbilling; instead, we are referred to a mathematical discrepancy from which the qharge was pur *361 portedly inferred. The commission’s auditor could only testify that an audit of Court Carpentry’s books showed “ a discrepancy between hours billed to customers and hours paid to employees of 11,757 hours ”, without any satisfactory explanation for the difference. This discrepancy can be explained, in the commission’s words, by one of two things: “Either the employees [of Court Carpentry] were not paid for 11,757 hours that they worked or the customers were billed for 11,757 hours for which they did not receive work * * * either they shorted the employees or overbilled the customers ”.
Surely, both prospects are well within the realm of possibility, but absent a further showing that customers had lodged complaints of overbilling, or that individual employees had complained of uncompensated services, or, for that matter, that agents of various steamship companies, or the companies themselves for their own reasons, had a hand in these alleged shortchanges, the fact of a mathematical discrepancy alone is not of sufficient probative value to support either inference. Perhaps the discrepancy was only that, a mathematical error; so too, it may only suggest that different employees worked “ off the books; ” or further, as one of the Lacquas suggested, perhaps the discrepancy is partly explained by Court Carpentry’s haphazard policy of using CC Lumber yardmen on ships while leaving them on the CC payroll: implying further that the discrepancy was the product of a number of different factors. A multitude of possibilities do suggest themselves, including the one considered and apparently rejected, but certainly never conceded to, by the commission that certain employees were not paid for work done. And, under the circumstances, the petitioner, contrary to the commission’s urgings, apparently acceded to by the court, was under no burden of coming forward with countervailing evidence to explain the discrepancy. Petitioner had been charged with intentional overbilling and it was incumbent upon the commission to sustain that charge on the evidence adduced. As it is, there has been a complete failure of proof on the charge and we return to where we began with the fact of á discrepancy and nothing more. There is just no substantial evidence to support the conclusion that the discrepancy was the product of some improper business practice and the finding to that effect cannot be credited (Matter of Erin Wine & Liq. Store v. O’Con *362 nell, 283 App. Div. 443, affd. 307 N. Y. 768; Matter of Kopec v. Buffalo Brake Beam-Acme Steel & Malleable Iron Works, 304 N. Y. 65; 32A C. J. S., Evidence, § 1021, snbd. [b], pp. 652-654).
The commission, as fact finder, could, of course, reasonably have rejected any or all of the several reasons tendered by the Lacquas to explain away the discrepancies but, in so doing, it was not at liberty to substitute the truly untenable assumption that the disparity was attributable to some wrongdoing, or, further, to infer that there were actually instances of intentional over-billing.
The third charge, based on an asserted violation of sections 723 and 724* of the Labor Law — which the commission has sustained— alleges that the Lacquas, with Anthony Scotto, now vice-president of the International Longshoremen’s Association (ILA) and the husband, of Marion Scotto, a niece of Leo Lacqua, had negotiated a loan with Kings County Lafayette Trust Company on behalf of Newbrook Enterprises, Inc., a family real estate holding corporation in which Marion Scotto and the Lacquas are equal shareholders. The loan was guaranteed by each shareholder, by CC Lumber and Court Carpentry and, in view of bank policy requiring the spouses of substantial stockholders of a borrowing corporation to sign separate personal guarantees, by Anthony Scotto and Mary Lacqua, Leo’s wife. The evidence further shows that the bank’s negotiator was aware of Scotto’s involvement with the ILA and that the ILA was a large depositor with the bank. More importantly, however, there is no showing that Scotto had used his labor affiliations as leverage in the loan negotiations and a review of the evidence demonstrates that, despite file notations made solely on the bank’s own initiative and for internal reference, the loan was granted based upon the *363 applicant’s own financial history and dealings with the bank. Scotto’s participation was for his wife’s benefit and the guarantee which he signed, merely a formal requirement of the bank.
"Whatever our view of Scotto’s activities on behalf of New-brook, even, though substantial, we are concerned with whether a predicate violation under section 723 of the Labor Law has been established: namely, whether, on these facts, Scotto’s interest, through his wife, in this wholly separate, family-owned corporation of which the Lacquas were, coincidentally, also principals, constituted a breach of his fiduciary obligations owing to the ILA. To be sure, the fact of his involvement in the corporate affairs of Newbrook, explored at length in the court’s opinion, is relevant, but only insofar as it points to the extent of his interest — which on the basis of the evidence adduced must now be taken as real, albeit indirect — and further defines the Lacquas continued acquiescence in the involvement. Real though the ihterest may be, it must, nevertheless, also be “in any business or transaction of * * * an employer whose employees his labor organization represents ” (Labor Law, § 723), before a breach of the statutory prohibition is made out. That is certainly not this case, since Scotto had no interest in CC Lumber, nor were the loan negotiations undertaken on its behalf, and there is no evidentiary support for the proposition that New-brook Enterprises was a sham corporation organized for the purpose of circumventing the Labor Law proscriptions against “ direct or indirect interests ”.
But even were we to ignore the fact of Newbrook’s status as a third corporate entity and agree that business relations with corporate principals suffices as an indirect interest, the Appellate Division was correct in holding that these apparently innocent transactions among close relatives, and undertaken openly on behalf of a small family corporation, are not the sort proscribed by the Labor Law provisions. This is not a case where a union official’s conduct is explainable only in terms of some surreptitious attempt to avoid the responsibilites which the law assigns. And what is deemed objectionable amounts, to no more than an ordinary incident of close family ties. Under the circumstances, it would appear just as reasonable to base the denial of a license on the fact that one of the licensees — or for that matter, a sister of the licensees —is related to a labor leader.
*364 As it is, the present charges are raised in an independent licensing proceeding, and were we to conclude that Scotto’s interest in Newbrook Enterprises was violative of section 723, the fact of a technical transgression, although acquiesced in by petitioner’s principals, does not establish that they lacked good character or integrity within the meaning of the Waterfront Commission Act. While such blanket interdictions against potential conflicts of interest might well be essential to insure against corruption in labor relations, absent some further showing of intentional wrongdoing or efforts at purposeful circumvention of the law, or that either the employer or the union official stood to gain at the expense of labor, the proscribed interest cannot be invoked as an automatic bar to a license in a separate licensing procedure. Sections 723 and 724 have their own enforcement provisions, which include criminal as well as civil sanctions for established breaches of fiduciary duties. There is no compelling necessity that additional sanctions be imposed by spontaneously defining good character or integrity to exclude those alleged to have committed technical violations of the Labor Law.
Finally, the charge that Leo Lacqua committed “ fraud ” at an earlier commission interview when he allegedly testified that Anthony Scotto had never acted on behalf of Newbrook and the evidence establishes that Scotto had, in fact, participated in loan negotiations and, with others, had personally guaranteed the note, cannot be sustained. Taken contextually, the representation made by Mr. Lacqua was that Scotto had no say in the corporate policy of Newbrook but acted for his wife’s benefit, since Newbrook was entirely a Lacqua family affair, and that he had never used his influence to advance the interests of CO Lumber or Court Carpentry in contract negotiations with steamship companies.
In sum, the evidentiary showing relied upon by the commission was unusually weak. Though corruption on the waterfront presents many special problems, denial of a license to operate must be supported by a firm factual foundation, not suspicion or surmise. Measured in terms of all the evidence adduced, the fact of close family relations, an indirect interest in a third corporation and the candor with which the principals had conducted themselves throughout, there has been no breach of fiduciary obli *365 gations owing the ILA. .Even if there were, a per se rule, as advanced by the court, would be wholly out of place where the underlying allegation in a licensing procedure is that the principals lacked ‘ ‘ good character and integrity ’ connoting, as that does, a degree of moral turpitude or some conscious legal dereliction.
Accordingly, the order appealed from should be affirmed.
Judges Beegan, Beeitel and Gibson concur with Judge Jasen ; Judge Scileppi dissents and votes to affirm in a separate opinion in which Chief Judge Fuld and Judge Bubke concur.
Order reversed, with costs, and the determination of the commission reinstated.

 Section 723 of the Labor Law provides in part:
“1. * * * [I]t shall constitute a violation of his fiduciary obligation for an officer or agent of a labor organization:
“ (a) To have, directly or indirectly, any financial interest in any business or transaction of either an employer whose employees his labor organization represents or seeks to represent for purposes of collective bargaining, or an employer who is in the same industry as such an employer”.
Section 724 of the Labor Law provides in part:
“ No employer * “ * shall knowingly participate in or induce any conduct or act which violates any of the obligations of any officer or agent of a labor organization provided in section seven hundred twenty-three.”